**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

CAROL L. CAMPBELL,                    )        CASE NO. 3:13-CV-58
                                      )
      Plaintiff,                     )
                                      )        MAGISTRATE JUDGE
    v.                             )        VECCHIARELLI
                                      )
CAROLYN W. COLVIN,                    )
    Acting Commissioner of Social  )
    Security,                      )        **MEMORANDUM OPINION AND**
                                      )        **ORDER**
           Defendant.          )

Plaintiff, Carol L. Campbell ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"),[1] denying her applications for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a) and for

Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under the Act, 42

U.S.C. §§ 416(i), 423.  This case is before the undersigned United States Magistrate

Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C.

§ 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I.    PROCEDURAL HISTORY

On May 6, 2009, Plaintiff filed her applications for SSI, POD and DIB, alleging a

disability onset of March 1, 2007.  (Transcript ("Tr.") 9.)  The applications were denied

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of
Social Security.  She is automatically substituted as the defendant in this
case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id*.)  On June 28, 2011, an ALJ held Plaintiff's hearing.  (*Id*.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id*.)  A vocational expert ("VE") also participated and testified.  (*Id*.)  On September 16, 2011, the ALJ found Plaintiff not disabled.  (Tr. 16-25.)  On November 6, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On January 9, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 17, 18.)  Plaintiff argues that – for various reasons – substantial evidence does not support the ALJ's determination of her residual functional capacity ("RFC") – and that the ALJ erred in determining that she was capable of performing her past relevant work as a laborer.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born on August 25, 1959. (Tr. 146.)  She completed one year of college.  (Tr. 78.)  She had past relevant work as a laborer at a bakery.  (Tr. 78, 194.)

### B.  Relevant Medical Evidence

#### 1.  Treatment Notes

In March 2005, Jeanie Hofacker, ACSW, LISW, a counselor at Firelands Counseling and Recovery Services ("Firelands") in Norwalk, Ohio, prepared a narrative summary of Plaintiff's treatment.  (Tr. 353-55.)  Ms. Hofacker noted that Plaintiff had

2

been undergoing treatment at the agency's Erie County location, but was relocating to Norwalk and, thus, was transferring her care to that location.  (Tr. 353.)  The summary noted the following:  Plaintiff reported a history of extreme anxiety, difficulty sleeping, poor appetite, difficulty concentrating and paying attention, and nervousness.  (*Id*.)  She had been treating with Carlos Lowell, D.O., had improved "with his help and medication."  (*Id*.)  Plaintiff was oriented, in contact with reality, and demonstrated neither memory deficits nor homicidal or suicidal ideation.  (*Id*.)  Plaintiff described interpersonal problems with family and co-workers.  (Tr. 353-54.)  Ms. Hofacker diagnosed Plaintiff with generalized anxiety disorder, and assigned her a Global Assessment of Functioning ("GAF") score of 59.  (Tr. 355.)

In March 2005, Firelands psychiatrist Carlos G. Lowell, D.O., noted Plaintiff's report that she was "doing pretty good" on Valium and that her mood had improved to the extent that she was taking Valium only once each day.  (Tr. 415.)  Dr. Lowell described Plaintiff's mental status as appropriate, noting her pleasant and cooperative behavior, normal speech, euthymic and appropriate affect, and linear thought process with intact ego boundaries.  (*Id*.)  Plaintiff did not attend a scheduled appointment on June 1, 2005.  (Tr. 414.)

In August 31, 2005, Plaintiff reported increased anxiety due to health concerns. (Tr. 413.)  Dr. Lowell noted that Plaintiff was not taking her Valium and opined that her mood disorder had worsened as a result.  (*Id*.)  Dr. Lowell instructed Plaintiff to restart Vaslium.  (*Id*.)  On November 11, 2005, Plaintiff reported that her mood had stabilized and that she did not consistently require the Valium.  (Tr. 412.)  Plaintiff complained of

3

increased anxiety due to financial and health concerns.  (*Id.*)  Dr. Lowell described Plaintiff's psychiatric status as stable, and instructed her to decrease her dosage of Valium.  (*Id.*)

In January 2006, Dr. Lowell increased Plaintiff's dosage of Valium after her anxiety symptoms increased.  (Tr. 411.)  Plaintiff described multiple stressors to Dr. Lowell.  (*Id.*)  After an April 2006 examination, Dr. Lowell continued Plaintiff on the increased dosage of Valium, noting that Plaintiff's mother was ill and Plaintiff was experiencing health problems.  (Tr. 410.)  In July 2006, Dr. Lowell noted that Plaintiff's psychiatric status was stable, although she reported increased insomnia and agitation resulting from family issues.  (Tr. 409.)  In September 2006, Plaintiff reported that she was compliant with her Valium regimen, but was having increased insomnia.  (Tr. 408.)  Dr. Lowell continued the Valium and prescribed Desyrel.  (*Id.*)

In December 2006 and March 2007, Dr. Lowell continued to describe Plaintiff's status as stable, despite psychosocial stressors, noting her euthymic and appropriate affect.  (Tr. 406 (March 2007), 407 (December 2006).)  Plaintiff failed to attend an appointment with Dr. Lowell in June 2007, and cancelled an appointment in September 2007.  (Tr. 404, (September 2007), 405 (June 2007).)  In October 2007, Plaintiff reported feeling stable with increased coping skills despite multiple stressors.  (Tr. 403.)  Dr. Lowell described Plaintiff's psychiatric status as "showing progressive improvement" and discontinued her Valium at her request.  (*Id.*)

In January 2008, Dr. Lowell examined Plaintiff, who reported insomnia, nervousness and anxiety, particularly because she was being assessed for skin cancer.

4

(Tr. 361.)  Dr. Lowell recommended that Plaintiff restart Valium and Desyrel.  (*Id*.)  A social worker at Firelands described Plaintiff's affect and behavior as appropriate.  (Tr. 434.)  Later in January 2008, Plaintiff failed to attend an appointment with the social worker.  (Tr. 433.)  On April 9, 2008, Plaintiff failed to attend a scheduled appointment with Dr. Lowell.  (Tr. 360.)

On October 2, 2008, the Firelands social worker reported that Plaintiff had returned for therapy "after a lengthy absence," and noted Plaintiff's report that her life was "always full of drama."  (Tr. 431.)  The social worker noted Plaintiff's anxious and depressed affect and behavior.  (*Id*.)  Plaintiff cancelled an appointment with the social worker on October 16, 2008.  (Tr. 432.)

On October 29, 2008, Plaintiff reported increased anxiety, depression and insomnia, as well as ongoing difficulties with her daughter and concerns for her granddaughter's safety.  (Tr. 359.)  Dr. Lowell described Plaintiff as oriented, and pleasant and cooperative, noting her self-description of "I'm a wreck."  (*Id*.)  He noted that her affect was "sad, anxious and tearful," that her thought process involved "subtle degree of drama," and that she had "questionable ego boundaries."  (*Id*.)  He instructed her to restart Valium, and added Remeron to her medication regimen.  (*Id*.)  He discussed coping skills and the possibility of adding a low-dose atypical antipsychotic, and recommended that Plaintiff undergo supportive psychotherapy.  (*Id*.)

On December 10, 2008, Plaintiff did not attend her scheduled appointment with Dr. Lowell.  (Tr. 358.)  She also failed to attend or cancel her appointment with the social worker the next day.  (Tr. 428.)  On February 12, 2009, the social worker noted

that Plaintiff was nervous and occasionally hysterical during their session.  (Tr. 427.)
Plaintiff described family problems involving her son and his girlfriend.  (*Id*.)  The social
worker assisted her in using relaxation techniques and recommended that she see Dr.
Lowell.  (*Id*.)  In March 2009, the social worker noted that Plaintiff was distressed over
her health problems.  (Tr. 424.)  On March 11, 2009, Plaintiff reported to Dr. Lowell that
she was doing well as long as she took her Valium.  (Tr. 357.)  He noted Plaintiff's
euthymic and appropriate affect, linear thought process, and intact ego boundaries.
(*Id*.)  He described Plaintiff's psychiatric status as "showing progressive improvement."
(*Id*.)

On April 1, 2009, Plaintiff cancelled an appointment with the social worker.  (Tr.
423.)  Later in April 2009, the social worker described Plaintiff's affect as "anxious
toward the beginning but bright and cheerful and trying very hard to control."  (Tr. 422.)
Plaintiff described continued issues with her family.  (*Id*.)

On May 6, 2009, Plaintiff reported increased anxiety and panic, noting that she
was experiencing stress as a result of applying for benefits and because her family was
"harassing her."  (Tr. 356.)  Dr. Lowell noted that Plaintiff was alert and oriented.  (*Id*.)
Dr. Lowell instructed Plaintiff to take Valium, Vistaril and Celexa.  (*Id*.)  The next day,
Plaintiff canceled an appointment with the social worker.  (Tr. 421.)

In July 2009, Dr. Lowell increased Plaintiff's dosage of Valium and Celexa after
she complained that their effect wore off in between doses.  (Tr. 396.)  In September
2009, Plaintiff reported that she was "doing pretty good" despite ongoing health issues,
her mother's health issues and family problems with her sister.  (Tr. 395.)  Dr. Lowell

6

noted that she was "showing progressive improvement."  (*Id*.)

In September 2009, the Firelands social worker confronted Plaintiff about her missed appointments, and explained that her case would be closed if Plaintiff continued to miss scheduled appointments.  (Tr. 436.)  In October 2009, Plaintiff continued to report family problems, which caused her stress, and cancelled an appointment with the social worker.  (Tr. 419, 435.)  She cancelled a March 2010 appointment with the social worker.  (Tr. 610.)

On September 15, 2010, Plaintiff reported that she was only taking the Celexa "when I needed it," and Dr. Lowell explained that Plaintiff should be taking it on a daily basis.  (Tr. 613.)  Dr. Lowell noted that he "informed [Plaintiff] that Celexa only costs $4 at Wal Mart. [Plaintiff] is still smoking."  (*Id*.)  On December 1, 2010, Dr. Lowell noted that Plaintiff was experiencing "affective instability, anxiety and difficulty processing information," but declined to take any new medications.  (Tr. 612.)  With respect to her mental status, Dr. Lowell noted that Plaintiff had "some disorganization of thought processes," and "questionable ego boundaries."  (*Id*.)  Plaintiff continued to decline to take alternative medications, but agreed to take Vistaril.  (Tr. 612.)  During a session on December 2, 2010, Plaintiff expressed a desire to restart Valium, but agreed not to seek it after the social worker reminded her that she had functioned fine without it for some time. (Tr. 601.)

On January 17, 2011, Plaintiff reported to the social worker that she was "basically homeless" because she had "worn out her welcome" in one city and her friends in another city could not take her in.  (Tr. 600.)  She described herself as "barely sleeping," and having no appetite.  (*Id*.)  Plaintiff claimed that she and her family had

been victimized by the law enforcement system.  (*Id.*)  The social worker opined that Plaintiff's report was "not based on reality" and recommended that Plaintiff be hospitalized.  (*Id.*)  Plaintiff declined hospitalization.  (*Id.*)  The social worker opined that Plaintiff was "so self absorbed that she has difficulty focusing."  (*Id.*)

On February 4, the social worker described Plaintiff as oriented, appropriate and clear, with an anxious and depressed affect.  (Tr. 598.)  Plaintiff was able to use relaxation exercises to calm herself, and again declined hospitalization.  (*Id.*)

On February 7, 2011, Karen E. Russell, PCC-S, LCDC III, the coordinator of outpatient mental health at Firelands,[2] drafted a letter to a municipal court judge on Plaintiff's behalf.  (Tr. 653.)  Ms. Russell described Plaintiff as experiencing paranoid and delusional behavior, extreme anxiety and depression.  (*Id.*)  She reported that Plaintiff's symptoms often interfered with her ability to make progress, and that then-recent changes to her medication regimen had exacerbated Plaintiff's symptoms.  (*Id.*)  According to Ms. Russell, Plaintiff's options to address her issues were limited by her inability to tolerate medications.  (*Id.*)

On March 9, 2011, Plaintiff again reported difficulties with the legal system and her family.  (Tr. 596, 611.)  Dr. Lowell noted that Plaintiff's appearance was "slightly disheveled" and that she was sad, tearful and irritable.  (*Id.*)  He opined that she was demonstrating "significant derailment" with persistent paranoid delusions and "marked loosening of ego boundaries."  (*Id.*)

---

[2]     The record does not reflect that Ms. Russell treated or examined Plaintiff at Firelands, with the exception that she was present during Dr. Lowell's March 9, 2011 examination of Plaintiff.  (Tr. 611.)

### 2.    Agency Reports

On July 22, 2009, agency consulting psychologist Irma Johnston, Psy.D.,

performed a psychiatric review technique and a mental RFC assessment.  (Tr. 362-75;

376-79.)  She diagnosed Plaintiff with mood disorder, combination anxiety and

depression, and generalized anxiety disorder.  (Tr. 365, 367.)  Dr. Johnston opined that

Plaintiff had a mild limitation in activities of daily living, and moderate restrictions in

maintaining social functioning and maintaining concentration, persistence and pace.

(Tr. 372.)  In her mental RFC assessment, Dr. Johnston opined that Plaintiff was

moderately limited in the ability to: maintain attention and concentration for extended

periods; complete a normal workday and workweek without interruptions from

psychologically-based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; interact appropriately with the general

public; get along with coworkers or peers without distracting them or exhibiting

behavioral extremes; and respond appropriately to changes in the work setting.  (Tr.

376-77.)  Dr. Johnston concluded that Plaintiff had the following capabilities:

> [C]apable of performing simple and complex tasks.  She can
> interact with others on a superficial basis, without having to
> supervise or persuade others.  She should work in an
> environment without frequent changes or strict production
> standards, due to decreased stress tolerance. [Plaintiff's]
> allegations are credible, as they are generally consistent
> with the medical evidence in [the] file.

(Tr. 378.)

On November 23, 2009, agency consultant Carl Tishler, Ph.D., confirmed Dr.

Johnston's assessment.  (Tr. 437.)

9

### 3. Third Party Statements to the Agency

On May 19, 2009, Plaintiff's mother, Florine Harkness, completed a third-party adult function report.  (Tr. 184-91.)  She reported that she was with Plaintiff "all the time," and that they did "everything" together.  (Tr. 184.)  Ms. Harkness reported that Plaintiff had difficulty concentrating.  (Tr. 185.)

## C. Hearing Testimony

### 1. Plaintiff's Hearing Testimony

At her June 28, 2011 administrative hearing, Plaintiff testified as follows:

Plaintiff lived with her mother, who was disabled, and Plaintiff's sister.  (Tr. 31.)  She could not live in her own home because she had "reported conspiracy" in the police department in Norwalk, Ohio, where she lived.  (Tr. 32.)  Every time she left her mother's home in Norwalk, police officers drove by, and at one point, a police officer stopped and stared at her nephew.  (Tr. 39.)  Plaintiff spent time in Norwalk and in Cleveland.  (Tr. 38-39.)

Plaintiff had a seven-year old granddaughter, whom Plaintiff babysat.  (Tr. 34.)  Plaintiff hadn't looked for work because her mental health treatment and physical ailments made it impossible.  (Tr. 45.)  Plaintiff did not drive because she did not have a license, but a friend drove her back and forth between Norwalk and Cleveland.  (Tr. 40-41.)

Plaintiff did not have medical insurance, and she borrowed money in order to pay for her medications.  (Tr. 49.)  During her most recent appointment with Dr. Lowell, he

had prescribed Haldol and Cogentin.  (*Id*.)[3]  She was worried about Dr. Lowell's prescriptions, however, because he had taken her off of Valium and "he was acting strange."  (Tr. 49-50.)  Although she was still taking Vistaril, she was not taking Celexa because she could not afford it.  (Tr. 50.)

Plaintiff felt that she was not capable of working because she was "always so stressed."  (Tr. 60.)  She experienced panic attacks and had problems concentrating. (Tr. 61.)  Plaintiff was "depressed all the time."  (Tr. 65.)  She didn't want to do "anything," and had problems sleeping.  (*Id*.)  Plaintiff was afraid to take medicine because she was allergic to many medications.  (*Id*.)

Plaintiff began her day by preparing food for herself and her mother.  (Tr. 70.) She generally stayed home all day, trying "to keep calm and stress free."  (Tr. 71.)  She stayed in her room all day.  (Tr. 70-71.)  She washed dishes.  (Tr. 71.)  She rarely left home because she was afraid to run into people.  (*Id*.)  Plaintiff experienced three or four panic attacks each day.  (Tr. 72.)  She also experienced crying spells.  (Tr. 74.)  Dr. Lowell wanted to hospitalize her, but she said, "no, I don't need a hospital.  All I just need to be around is some good friends.  Don't put me in the hospital, because ain't no telling what you do.  People try drugs and stuff like that."  (*Id*.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ asked the VE to consider "a younger individual . . . [who] could do light work, simple routine tasks, no public interaction and brief interactions with supervisors. (Tr. 78.)  The VE testified that the hypothetical individual could perform Plaintiff's past

---

[3]    The administrative transcript does not contain medical records reflecting Dr. Lowell's prescribing of these medications.

relevant work as a laborer in the bakery.  (*Id*.)  The VE also opined that the hypothetical individual could perform work as a laundry worker, of which there were 825 positions locally and 82,600 nationally; office helper, of which there were 110 jobs regionally and 11,000 nationally; or clothing marker, of which there were 366 jobs regionally and 36,600 nationally.  (Tr. 79.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a

12

severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

In her September 16, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1. Plaintiff meets the insured status requirements of the Act through December 31, 2009.

2. Plaintiff has not engaged in substantial gainful activity since March 1, 2007, the alleged onset date.

3. Plaintiff has the following severe impairments: psychosis, not otherwise specified; general affective disorder; fibromyalgia; peripheral vertigo; and residual swelling on the face due to possible Bell's palsy.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to lift twenty pounds occasionally and ten pounds frequently; stand and walk six hours in a full work day and sit in six hours of the work day. Plaintiff must have no interaction with the public and brief interaction with supervisors and co-workers.

6. Plaintiff is capable of performing past relevant work as a laborer. This work

13

does not require te performance of work-related activities precluded by Plaintiff's RFC.

7.  Plaintiff has not been under a disability, as defined in the Act, at any time from March 1, 2007 through the date of this decision.

At step five of the sequential evaluation, the ALJ made the alternative finding that Plaintiff was capable of working as a laundry worker, office helper, and clothing marker.

(Tr. 11-18.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

14

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

Plaintiff argues that – for various reasons – substantial evidence does not support the ALJ's determination of her RFC, and that the ALJ erred in determining that she was capable of performing her past relevant work as a laborer.  The Commissioner generally argues that substantial evidence supports the ALJ's decision.

**1.      Concentration, Persistence and Pace**

Plaintiff argues that the ALJ's calculation of her RFC failed to sufficiently account for Plaintiff's limitations with respect to concentration, persistence and pace.  Plaintiff notes that, at step three of the sequential analysis, the ALJ assigned Plaintiff moderate limitations in concentration, persistence and pace.  Plaintiff contends that the non-exertional limitations in her RFC do not sufficiently account for that limitation.  Plaintiff's argument is not well taken.

In her determination of Plaintiff's RFC, the ALJ limited Plaintiff to "no interaction with the public and brief interaction with superiors and coworkers."  (Tr. 14.)  This limitation does not address the ALJ's determination that Plaintiff was moderately limited in maintaining concentration, persistence and pace.  However, in her hypothetical question to the VE, the ALJ described an individual who was limited to "simple, routine

15

tasks, no public interaction and brief interaction with supervisors." (Tr. 78.) In response to the ALJ's hypotheticals, the VE testified that the individual described by the ALJ could perform Plaintiff's past relevant work as a laborer in a bakery, as well as work as a laundry worker, office helper, and clothing marker. (Tr. 78-79.) The ALJ based her decision that Plaintiff was not disabled on Plaintiff's ability to perform these same positions. (Tr. 17-18.) Accordingly, although the RFC set forth in the ALJ's decision does not match the hypothetical questions posed to the VE, to the extent that substantial evidence in the record reflects that the hypothetical questions accounted for Plaintiff's limitations, any error arising out of the discrepancy is harmless and does not require remand.

Plaintiff acknowledges that the ALJ assigned additional non-exertional restrictions in her hypothetical questions, but conclusorily asserts that those restrictions are not sufficient to address Plaintiff's mental limitations. To support her argument, Plaintiff – relying on boilerplate language that this Court has encountered in multiple other briefs prepared by her counsel – cites to several decisions from this Court concluding, in each case, that the ALJ's determination of the claimant's RFC does not adequately address the claimant's moderate limitations in this area. (Plaintiff's Brief ("Pl. Br.") at 4-5.) However, none of these decisions compels remand in this case. Rather, in each of the decisions cited by Plaintiff, the ALJ either entirely omitted non-exertional limitations, *see Thompson v. Astrue*, No. 3:10-cv-1688, 2011 WL 3298904 (N.D. Ohio Aug. 2, 2011) (White, M.J.); *McNemar v. Comm'r of Soc. Sec.*, No. 1:10-cv-2079, 2011 WL 5586378 (N.D. Ohio Nov. 15, 2011) (Adams, J.); or only limited the claimant to simple, routine, repetitive work, which addressed the claimant's limitation in

16

concentration without addressing the claimant's limitations in persistence and pace, *see Alexander v. Comm'r of Soc. Sec.*, No. 3:11-cv-1254, 2012 WL 1658707 (N.D. Ohio May 11, 2012) (White, M.J.); *Candela v. Astrue*, No. 1:10-cv-1603, 2011 WL 3205726 (N.D. Ohio July 28,2011) (White, M.J.); *Miller v. Comm'r of Soc. Sec.*, No. 1:09-cv-2369, 2011 WL 4943954 (N.D. Ohio Oct. 17, 2011) (Baughman, M.J.); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010). Contrary to Plaintiff's argument, none of these cases stand for the blanket assertion that finding moderate limitations in concentration, persistence and pace require an ALJ to assign a specific set of limitations. *See, e.g., Jackson v. Comm'r of Soc. Sec.*, No. 1:10-cv-763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011) (Boyko, J.) (*Ealy* "does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace."). Rather, each of these cases requires only that an ALJ's hypothetical to the VE adequately describes a claimant's limitations. *Ealy*, 594 F.3d at 516.

Here, the ALJ's hypothetical questions imposed restrictions to simple, routine tasks – which addressed Plaintiff's moderate limitation in concentration. There is no evidence in the record that Plaintiff was limited in her ability to maintain persistence and pace, such that the ALJ erred in failing to assign restrictions in those areas. Further, Plaintiff points to no legal authority holding that the restrictions assigned by the ALJ in this case were insufficient to address Plaintiff's limitations. She points to no evidence in the record that supports a need for additional or greater non-exertional limitations. Indeed, other than conclusorily asserting that the restrictions are insufficient, she fails to

argue or explain how the restrictions failed to account for Plaintiff's non-exertional limitations.  Accordingly, this argument lacks merit.

### 2.    State Agency Consultants Drs. Johnston and Tischler

In his RFC assessment, Dr. Johnston determined that Plaintiff was capable of both simple and complex tasks, but opined that she should be limited to superficial interaction with coworkers and supervisors, and work in "an environment without frequent changes or strict production standards, due to decreased stress tolerance." (Tr. 378.)  Dr. Tischler affirmed Dr. Johnston's opinion.  (Tr. 437.)  Plaintiff correctly notes that the ALJ assigned "great weight" to these opinions.  (Tr. 16.)  However, according to Plaintiff, the ALJ erred in failing to adopt – or to explain his decision not to adopt – Dr. Johnston's limitations restricting Plaintiff from more than superficial interactions with coworkers and supervisors, and precluding her from working in an environment with frequent changes or strict production standards.

Although an ALJ is not required to adopt each and every finding of medical sources to which he has assigned weight, the ALJ is required to explain why he relied on certain findings and not others.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

18

Plaintiff's argument is well taken.  Here, the ALJ did not explain her decision to omit restrictions in these areas despite Dr. Johnston's opinion that such restrictions appropriate.  The requirement of Ruling 96-8p is clear: an ALJ must explain her decision not to adopt a medical source opinion that conflicts with her RFC.  Here, despite granting great weight to Dr. Johnston's opinion – and to Dr. Tischler's opinion affirming Dr. Johnston's conclusions – the ALJ did not include restrictions on Plaintiff's ability to engage in greater than superficial interaction with her coworkers, adapt to frequent changes in the work place, or work within strict production standards.  Because these limitations conflict with the RFC – as the RFC contains no restrictions in these contexts – SSR 96-8p requires the ALJ to explain their omission.  The ALJ's failure to do so in this case violates the requirements of SSR 96-8p.

The Commissioner argues that the record does not support Dr. Johnston's restrictions, and, thus, that those portion of his opinion were not entitled to great weight.  The Commissioner points to evidence in the record that Plaintiff responded to medication and therapy, and that, when Plaintiff's symptoms increased in severity, it was for a brief period of time and usually due to non-compliance with medication.  Although the record reflects that Plaintiff generally did respond to counseling and medication – and deteriorated when she was not compliant with her treatment regimens – the ALJ did not identify these reasons as a basis for rejecting some of the limitations set forth by Dr. Johnston.  "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs.*

19

*Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation omitted)).

Accordingly, this argument cannot prevent remand on this issue in this case.

The Commissioner also argues that any error by the ALJ in this regard is harmless because the occupations identified by the VE do not require any of the skills precluded by Dr. Johnston's limitations. This argument is well taken, at least with respect to two of the three positions identified by the VE as alternatives to Plaintiff's past relevant work. The VE identified – and the ALJ adopted – three such positions: Office Helper (Dictionary of Occupational Titles ("DOT") Listing 239.567-010), Laundry Worker, Domestic (DOT Listing 302.685-010); and Marker (DOT Listing 209.587-034).[4] A review of the relevant DOT listings reveals that, even if Plaintiff were limited to superficial interactions with coworkers and supervisors in an environment without frequent changes or strict production standards, she would be able to perform the positions of Laundry Worker, Domestic (DOT 302.685-010); and Marker (DOT 209.587-034). Each of these positions is characterized as involving the lowest level of interaction with people

---

[4]  The ALJ determined that Plaintiff could return to her past relevant work as an Assembler, Motor Vehicle (DOT 806.684-010). (Tr. 17.) The record contains very little information regarding this position. In an "interrogatory" – the term used by the ALJ in her decision (tr. 17) – submitted prior to Plaintiff's hearing, the VE identified this position as one in which Plaintiff had past relevant work. (Tr. 240.) In a May 2009 Work Questionnaire, Plaintiff indicated that she had worked as an assembler from 1998 until 2000. (Tr. 193.) Plaintiff described the job as "built transmission kits – worked assembly line." (Tr. 197.) During the administrative hearing, neither Plaintiff's counsel nor the ALJ elicited testimony from Plaintiff regarding her duties in this position. Further, the VE did not testify or otherwise opine regarding the characteristics of this position. Rather, he opined that Plaintiff could return to her past relevant work as a laborer in a bakery. (Tr. 78.) Neither party addresses whether substantial evidence supports the ALJ's conclusion with respect to this position.

20

assigned in the DOT – limited to "taking instructions – helping"[5] – and each is rated as "performing repetitive or short cycle work."  *See* DICOT 302.685-010, 1991 WL 672657 (2008); DICOT 209.587-034, 1991 WL 671802 (2008).

Further, although each Listing provides that the job is light exertional level where it is performed "at a production rate pace," *see e.g.,* DICOT 209.587-304, this characteristic does not preclude Plaintiff from performing it, even in light of Dr. Johnston's restrictions.  Rather, because "[t]he DOT lists *maximum* requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings," SSR 00-4p, 2000 WL 1898704, * 3 (Dec. 4, 2000) (emphasis added), the fact that each of these jobs may be performed at a production rate pace in some settings does not preclude an individual with the limitations described by Dr. Johnston from performing them.[6]  Accordingly, because Dr. Johnston's

---

[5]     The DOT explains that the fifth digit of a particular Listing's numerical code "expresses the worker's relationship" to people in a particular job. Department of Labor, *Dictionary of Occupational Titles*, Parts of the Occupational Definition (1991), available at www.oalj.dol.gov/public/dot/references/dotparts.htm (last visited July 25, 2013).  "As a general rule, Worker Functions involving more complex responsibility and judgment are assigned lower numbers . . . while functions which are less complicated have higher numbers." *Id*.  Here, each of the relevant occupations is assigned an 8 – the highest number and, thus, the lowest level of relating with people. *Id*.  The DOT describes this level as "[a]ttending to the work assignment instructions or orders of supervisor.  (No immediate response required unless clarification of instructions or orders is needed.)  Helping applies to 'non-learning' helpers."  Department of Labor, *Dictionary of Occupational Titles*, Appendix B (1991), available at www.oalj.dol.gov/public/dot/references/dotappb.htm (last visited July 25, 2013).

[6]     The restrictions assigned by Dr. Johnston likely preclude Plaintiff from working as an Office Helper.  The Listing for that position notes that it

restrictions would not preclude Plaintiff from performing work in two of the occupations

identified in the ALJ's decision, any error arising out of the ALJ's failure to discuss those

limitations is harmless, and does not warrant remand in this case.

### 3.    Plaintiff's Past Relevant Work

Plaintiff contends that the ALJ erred in failing to analyze whether Plaintiff's RFC

precluded her from performing the functions of her past relevant work.[7]  The record

reflects that, although the VE elicited testimony from Plaintiff regarding her past work as

in a bakery, the ALJ did not inquire about Plaintiff's past work as a assembler – the

position to which the ALJ determined Plaintiff was capable of returning.  Nor did the ALJ

ask the VE whether Plaintiff would be capable of returning to that position.  However, in

her decision, the ALJ stated that the VE had determined that Plaintiff was able to

perform the demands of this work.  (Tr. 17.)  The record does not reflect that the VE

made any such conclusion with respect to Plaintiff's work as an assembler.  However,

the ALJ made the alternative conclusion that Plaintiff could perform work in other

---

requires the performance of a variety of duties – which contravenes the
repetitive work requirement – and assigns the position a six with respect
to relating to people.  *See* DICOT 239.567-010, 1991 WL 672232 (2008).
The DOT describes a level six in this context as "Speaking-signaling:
Talking with and/or signaling people to convey or exchange information.
Includes giving assignments and/or directions to helpers or assistants."
Department of Labor, *Dictionary of Occupational Titles*, Appendix B
(1991), available at www.oalj.dol.gov/public/dot/references/dotappb.htm
(last visited July 25, 2013).  This requirement exceeds the superficial
interaction required by Dr. Johnston's opinion.

[7]    In her Brief, Plaintiff asserts that the ALJ failed to compare her RFC with
Plaintiff's past relevant work as a bakery laborer.  (Pl. Br. 6.)  However, as
discussed above, the ALJ determined that Plaintiff was capable of
performing her past relevant work as an automobile assembler.  (Tr. 17.)

occupations.  Accordingly, and because substantial evidence in the record supports this alternative conclusion,[8] any error by the ALJ in determining that Plaintiff could return to her past relevant work is harmless, and does not require remand.

### 4.    Therapist Russell

Plaintiff contends that the ALJ erred in failing to assign weight to the opinion of Ms. Russell, the therapist from Firelands who drafted a letter to a municipal court on Plaintiff's behalf.  In her letter, Ms. Russell described Plaintiff as experiencing paranoid and delusional behavior – particularly with respect to government and law enforcement agencies –  as well as extreme anxiety and depression.   (Tr. 653.)  In her decision, the ALJ concluded that Ms. Russell's opinion was neither clear nor supported by the record:

> A letter from [Plaintiff's] treating mental health physician,[9] Karen R. Russell, PCC-S, LCDC III, notes [Plaintiff] has been in treatment for the last eight to ten years and that she struggles with paranoia and that she sees herself as a victim of law enforcement.  The undersigned notes [Plaintiff's] symptoms have exacerbated with changes in her medication, however this information is vague and not supported by objective findings and is therefore, not probative of [Plaintiff's] ability to work as contemplated by the [RFC].  Nonetheless, the undersigned make[s] appropriate accommodations as described in the [RFC] assessment.

---

[8]      Plaintiff argues that the limitations set forth by Dr. Johnston preclude her from working in any of the alternative occupations identified by the ALJ, and, thus, substantial evidence does not support the ALJ's alternative conclusion.  (Reply Brief at 6.)  However, in resolving Plaintiff's argument regarding the ALJ's assessment of the opinions of the state agency consultants, this Court has already determined that this argument lacks merit.

[9]      The record does not reflect either that Ms. Russell is a physician or that she ever treated Plaintiff.

23

(Tr. 15.)

Plaintiff argues that the ALJ erred in failing to fully analyze the weight to assign to Ms. Russell's opinion.  However, Plaintiff does not explain how a more concise or straight forward analysis would change the outcome of her case.  She does not identify how Ms. Russell's opinion required any functional limitations that were not applied by the ALJ.  Accordingly, this argument lacks merit.

### 5.    Statement from Plaintiff's Mother

Finally, Plaintiff contends that the ALJ did not adequately analyze the statement from Plaintiff's mother, Florine Harkness.  In her decision, the ALJ noted that Ms. Harkness described Plaintiff has having difficulty concentrating.  (Tr. 16.)  The ALJ indicated that she had accommodated Plaintiff's concentration difficulties in the RFC. (*Id*.)  Although, as discussed above, the ALJ did not incorporate restrictions accounting for Plaintiff's concentration difficulties into the RFC in her decision, her hypothetical questions to the VE did contain limitations addressing this issue.  Plaintiff does not explain how further analysis of the weight assigned to Ms. Harkness's third-party statement would have resulted in additional limitations or otherwise affected Plaintiff's case.  Accordingly, this argument lacks merit.

### VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 5, 2013

24